Charles Sprague, Plaintiff in Error, *v.* The Illinois River Railroad Company *et al.*, Defendants in Error.

ERROR TO CASS.

An amendment to a railroad charter, which authorizes the consolidation of the road to be built under it, with any other intersecting road, and there terminates it, is not such an alteration of the project as will excuse a stockholder from paying his subscription for stock.

Any amendment of such a charter, as affecting the liabilities of stockholders, must be considered with a view to the profits to be derived from the stock, rather than any incidental advantage to be otherwise gained by the stockholder.

The common benefit to all the stockholders, rather than the benefit of one or a few of them, should control the action of those managing the enterprise.

Charles Sprague filed his bill in the Cass Circuit Court, showing that he is a resident of Cass county, and the owner of real estate situated in Cass county, and of personal estate, on which taxes are regularly levied for county purposes.   That an act was passed by the General Assembly of the State of Illinois, approved February 11th, 1853, incorporating the Illinois River

Railroad Company, for the purpose of building a railroad from Jacksonville, Morgan county, Illinois, to La Salle, in La Salle county, Illinois. That an order was made by the Cass County Court, for a vote, at the general election in 1853, for and against the subscription by the county of Cass, of $50,000 to the Illinois River Railroad, and the same amount to the Upper and Lower Mississippi Railroad, to be submitted in one proposition, as follows: "For the subscriptions," "Against the subscriptions." This vote resulted in a majority for the subscriptions.

The legislature, in 1854, passed an act, approved March 1, 1854, amending the Illinois River Railroad Company. The following amendments, among others, were made to the charter :

1st. It repealed that section of the original act appointing corporators, and appointed new corporators.

2nd. It provided that the Illinois River Railroad Company might consolidate with any road built, or to be built, and make connections with such road at any point on the route of the Illinois River Railroad, and that the Illinois River Railroad Company shall not be required to build that portion of the road north of such connection.

3rd. That the subscription of Cass county, as voted, shall not be affected by the amendment.

On the 10th of May, 1854, the Cass County Court directed the county judge, J. A. Arenz, to subscribe $50,000 to the stock of the Illinois River Railroad Company.

On the 10th of May, 1854, J. A. Arenz subscribed as follows: J. A. Arenz, agent and stockholder, Cass county, 500 shares, $50,000.

After the passage of the original act, and under the original charter as amended, the Illinois River Railroad Company was organized. At the session of the legislature in 1857, two acts were passed, amending the charter of the Illinois River Railroad, one section of which declares the vote of Cass county in 1853, to subscribe $50,000 to the Illinois River Railroad Company to be legally taken, and the subscription of J. A. Arenz to be legally made, and requires the County Court of Cass county to issue bonds to the amount of $50,000, and deliver them to the Illinois River Railroad Company.

The bill further shows, that the Illinois River Railroad Company, since their organization, have, under the amendatory act of 1st March, 1854, located their road from Virginia, Cass county, north to Pekin, and from Pekin have located their road across the Illinois river to a junction with the Peoria and Hannibal road, and are now building a bridge across the Illinois river, at Pekin, with a view to terminate said road at the junction with the Peoria and Hannibal road, and that the further

extension of the Illinois River road north of the junction is, from the character of the country and the existence of railroads, impracticable. The bill shows that the County Court of Cass county are about issuing and delivering county bonds, to the amount of $50,000, to the Illinois River Railroad Company, bearing eight per cent. interest from July 1st, 1857 ; makes the Illinois River Railroad Company, John A. Arenz, S. Paddock and J. Short, (the persons composing the Cass County Court,) parties, and prays an injunction restraining the County Court from issuing the bonds. The bill contains a prayer that on the hearing, the injunction may be made perpetual, and a prayer for general relief. The bill is verified by affidavit.

An order for an injunction was made by the master in chancery of Cass county, an injunction bond filed, and writ of injunction issued.

The answer of J. A. Arenz shows, among other things, that at the time of his subscribing $50,000 to the stock of the Illinois River Railroad Company, he did not know of the existence of the amendatory act of 1st March, 1854, the laws at that time not having been published.

The answer of the Illinois River Railroad Company admits the allegations of the complainant's bill to be true, with the following qualifications :

1st. That the directors of the Illinois River Railroad Company have never established any northern terminus at any point south of La Salle.

2nd. That although the road has been located from Pekin across the Illinois river, to the line of the Peoria and Hannibal road, and although an arrangement has been made with said road for running cars over their road, which arrangement is deemed advantageous, yet " it is believed " that the track of the Illinois River road will be extended " further north," and it is denied that the road has been located to the junction with the Hannibal and Peoria road, with a view to terminate it there permanently.

The answer sets out an order of the Cass County Court, made on the 5th August, 1857, which order directs that bonds of the county of Cass, to the amount of $50,000, drawing interest at eight per cent., be signed by the county judge and clerk ; that $15,000 of said bonds be paid over to the Illinois River Railroad Company, and the balance be deposited with certain bankers, to be paid to said company from time to time, in such amounts as calls are made for monthly installments.

At the November term of the Cass Circuit Court, the cause came on to be heard upon bill and the answers of the Illinois River Railroad Company and J. A. Arenz ; and the court,

HARRIOTT, Judge, presiding, thereupon ordered and decreed that the injunction be dissolved and the bill dismissed.

The plaintiff assigns for errors the dissolution of the injunction and the dismissal of the bill.

H. E. DUMMER, and LINCOLN & HERNDON, for Plaintiff in Error.

S. T. LOGAN and D. A. SMITH, for Defendants in Error.

*Opinion of the Court, by* CATON, C. J.   We do not think that the amendment to the charter to the Illinois River Railroad Company, which was passed in 1854, authorizes an essential and material departure from the purposes and objects specified in the original charter of that company, so as to make it a separate and distinct enterprise.   The original charter provides as follows: " And the said company are hereby authorized and empowered to locate and construct and finally complete a railroad from the town of Jacksonville, in Morgan county, via Virginia, in Cass county, to the town of Bath, Mason county, and thence by way of Pekin, in Tazewell county, Lacon, in Marshall county, to La Salle, in La Salle county." The amendment of the charter of 1854 authorized the company to unite or consolidate with any other road built, or to be built, and to make connections with such road at any point on the route of the Illinois River Railroad, and that they should not be required to build their road north of that point, unless a majority of the board of directors should think proper to do so.

We have no where met with a more satisfactory exposition of the general principles of law, governing the respective rights of corporations and individual stockholders therein, as connected with this subject, than in the case of *Barret* v. *The Alton and Sangamon Railroad Company*, 13 Ill. R. 504.   In determining the question as to how far the original purposes of a corporation may be departed from, after subscriptions have been made to its stock, without violating the rights of the stockholders individually, we must first consider with what intention, and in view of what advantages, the law must presume such subscriptions were made.   As is clearly manifest from the decision of the case above referred to, the conclusive presumption is that it was with a view to the profits to be derived from the stocks thus subscribed, as an investment, and not in reference to any incidental advantages which may accrue to the stockholders by reason of the construction of the improvement, in consequence of any anticipated enhancement of any other property which the stockholder may own, or otherwise.   To admit any other

presumption would be, in fact, a fraud upon the other stockholders. If the various collateral considerations which may have induced the different shareholders to subscribe for the stock can be taken into consideration, in determining in what manner the common enterprise may be carried out or executed, the common good of all must frequently be sacrificed to the particular good of one individual shareholder. If the various collateral considerations which induced each individual, composing the corporation, to subscribe for his stock, are to control in the execution of the enterprise or the management of the concern, it might frequently, and probably would in almost every case, be utterly impossible to carry on or complete it, for the reason that such collateral considerations or incidental inducements might be directly hostile to each other; to gratify one, would be to destroy the other. No inducement or consideration, but that which is supposed to promote the common good of all, can be sanctioned by justice or presumed by the law to exist. The presumption, then, is, that each one, when he enters into the association, agrees to do, and consents to have done, whatever may be supposed will and is intended to make the undertaking a success, and the investment a profitable one. In the commencement of an undertaking like that of a railroad, no human sagacity can foresee every contingency which may arise, or anticipate every obstacle which may present itself, in its prosecution, and all must know and anticipate that these contingencies or obstacles may make it necessary, for the common good, to make many and even important changes in the original plan, and each one is presumed to anticipate that such changes may become necessary, and to consent to them, when the majority, or those intrusted with the management of the common interest, shall deem it best (for the common good). It will not do to say that the subscriber is only presumed to consent to such changes or acts as are expressly authorized by the charter as it exists when he subscribes, and that he is always to be considered as protesting to any change of that charter or enlargement of the powers of the corporation, no matter how manifestly it may promote the common good of all. Such a rule would, in all cases, preclude the possibility of ever altering the charter of any corporation, without the express consent of all the shareholders. Then might one stupid or obstinate holder of one share tie up the hands of all the rest, to their utter ruin. Such a proposition needs no refutation. The history of private corporations, and the legislation of all countries in reference to them, show that no sane man ever became a corporator with such an understanding or intention. There must be a palpable abuse of power by the majority, or governing authority,

to the prejudice of the minority or dissenting portion, before the courts would be authorized to declare its exercise illegal. If the act is performed in good faith and with the real intent to promote the best interest of the concern, even though it might turn out disastrously, the act would be none the less legal. Bad faith or fraud would vitiate such acts, as well in these as in other cases. It is true that the original purpose or object of the corporation may not be entirely changed, or abandoned, and a new one undertaken—such as a railroad abandoned for a canal, or line of steamboats, or, possibly, one railroad route abandoned, and another, in an opposite direction and which could have no affinity to or connection with the first, adopted; but we know of no instance where the mere limitation or enlargement of the original plan or purpose has been held not to be within the implied powers of the majority or controling authority. The great extent of this implied power conferred by each shareholder upon the majority or controling authority of the corporation, or the nature of his implied agreement on this subject when he becomes a member of the corporation, may be familiarly illustrated by the history of railroad corporations from their first beginning to the present time, both in this country and in Europe. Take, for instance, the great New York Central Railroad. That was originally constructed and for many years operated by some seven or eight separate and distinct corporations. Subsequently an act of the legislature was passed, authorizing them all to consolidate, so that all should constitute but one company, owning and operating as one road all the different sections and branches formerly owned and operated by them separately; and this was done without the unanimous consent of all the stockholders of all the original corporations; to have required that, would have rendered the consolidation an impossibility, no matter how manifestly the proposed measure might have been for the common good of all; so many stockholders would have been found opposing it, with the intention of being bought up to give a consent which, in reality, their own interest demanded that they should give voluntarily, that nothing could ever have been done. It is a lamentable truth, that the history of human affairs shows that such is human nature, as exemplified by too many. The ever ready answer is, "May I not do with my own as I will?"

Let us now see how this consolidation affected the individual stockholders of the separate original corporations. Take, for instance, one who subscribed stock for the construction of the road between Albany and Schenectady. When he made that subscription he only expressly consented to become a part owner of that small section of road, some sixteen miles long; and had he

been asked, instead of becoming a part owner in that small enterprise, where his relative interest might be so considerable that his influence in its management might be sensibly felt, to become a part owner in that gigantic corporation as we now see it, he might very likely, and in all probability would, have refused to engage in it. And yet, having subscribed under these circumstances, all his subsequent remonstrances could prove of no avail, when the majority of his associates thought it for the interest of the whole to enter into the consolidation. Indeed the original stock, for which alone he subscribed, was taken from him, or rather destroyed, and he was compelled to take, in lieu thereof, stock in another company, to which he never subscribed or consented to be connected with. And this new company exhibits purposes and objects so much more extended than the old, that it is hardly proper even to call them of the same general character. Now here was certainly a great stretch of power, and no doubt considered by some a faithless trampling upon individual rights; but it has never been questioned, or if questioned, it has been sustained by the courts of that State, for it is now standing unimpeached as an existing fact. There were brought into this great corporation, not only the main trunk of the road between Albany and Buffalo, but a great many lateral roads and branches, as well as cut-offs, so that it covers, upon the map, a very considerable portion of the State; and yet, he who only subscribed to the insignificant affair of sixteen miles of road, has been compelled, against his will, though no doubt in promotion of his interest, to become a partner in this great enterprise. If he was compelled by law to submit to all this, then with the same propriety might he have been compelled to submit to an enlargement of the powers, and the necessary increase of the stock, of the little corporation in which he originally became a shareholder, so as to have enabled that to build and control all that great system of roads, or to have purchased them after they were built.

But this is not a solitary, though it may be the most important, instance of its kind. The history of our own legislation is full of similar laws, either authorizing consolidations or amending charters, and limiting or extending their powers and operations, and no instance can be found where the unanimous consent of all the shareholders of the corporations is made necessary to an acceptance of such amendments, or to effect a proposed consolidation. And the same may be said of the most of our sister States.

But it may be objected that this course of legislation and action, however uniform and long continued, cannot acquire the force of constitutional law, or rather of constitutional construc-

tion, and that this question involves the sacred right of individuals to possess, manage and enjoy their own as they may think best, as well as the right of contract, expressed or implied, upon entering into these associations. On the contrary, we think they are of the highest authority, in both points of view. Such a long continued and uniform acquiescence in the exercise of this power, by those interested in the stocks of these corporations, and by the profession, shows the undoubted understanding of all, that this is a rightful and necessary exercise of power, and he is a bold man indeed, who, supposing that he has been favored with some glimmer of constitutional light which has never been vouchsafed to any other, shall hold that this has all been but a usurpation of power, and a ruthless trampling upon individual rights. A becoming distrust of our own capacity should induce us to hesitate long, before upturning everything which has been so long considered settled, and so uniformly acquiesced in. But in another point of view this uniform legislation and practice is of the highest authority, leading us to the same result, though in an entirely different way. It serves to show what is the real character of the contract entered into when parties become members of such corporations. It shows what was the implied agreement about the management of the concerns in which they acquire interests. It shows that they do in fact and in truth intelligibly and understandingly consent, at that time, that a majority in interest, or the controling power fixed by the association, shall have the right to manage its concerns, even against their objections, in such manner as may be deemed best for the common good, within the limits prescribed by their course of legislation and practice. No rational man, upon becoming a member of a corporation, can suppose that for him the course of legislation is to be changed, and the mode of managing corporate concerns is to be subverted. He must expect that his interest will be managed in the same way that all others, under like circumstances, have always been managed; and to this he must be presumed to consent and agree at the time. He must be held to consent that the charter of the corporation may be amended, by enlarging or limiting its powers, or by modifying, limiting or extending its objects and purposes, in the same manner and to the same extent that other corporate charters have previously been changed; and that such amendment of the charter may be accepted, by the express vote of a majority of the stockholders in interest, or of the directors or managers of the corporation, either by a direct vote or by acting under it, or by any other mode of adoption known to the law. This seems to us so perfectly manifest that we deem it unnecessary to enlarge upon it.

By applying these principles to the case before us, we see there was nothing in the amendment of the charter passed in 1854, the acceptance of which by the corporation could in the least violate any of the rights of any of the subscribers to the stock. That amendment was much less objectionable than many others to be met with, the validity, or even propriety, of which has never been questioned. It was not a restriction of the corporate powers of the company to the prejudice of its interests or franchises, but it was an enlargement of its powers, which might be in fact indispensable to the successful prosecution of the enterprise, or to make its franchises of more value. The original charter authorized the company to construct a road from Jacksonville to La Salle, mentioning several towns through which it should pass, without otherwise designating the route, or stating at what point it should cross the Illinois river, and the work was required to be completed in ten years. The amendment, to which objection is now made, authorizes the company to unite or consolidate its road with any other road which it may intersect in its route, and dispenses with the obligation to build the road north of such point of intersection. But it does not compel the company to do either of these things. It is not even contended in the bill of complaint in this case that the acceptance of this amendment has in any way been injurious to the stock of the road, or that the adoption of one or all of the measures authorized by this amendment, would not really and materially enhance the value of the stock. We may well suppose that the very measures which the bill charges to be in contemplation of the board of directors, may be in the highest degree promotive of the interests of the company; and as before remarked, it is not even intimated that it would be injurious to it. To say that the interests of this company require it to run a road from Pekin to La Salle, alongside, or only separated by the river from the one already built and in operation, is simply absurd. But whether this be so or not, the minority of the stockholders must submit to the better judgment of the majority in reference to the questions of expediency. This whole proceeding seems to have been prosecuted upon the supposition that it was proper for the court to consider some ulterior interest or object which the shareholders had in view when they subscribed, rather than suppose that they could or ought to have no other object but the real value of the stock, and to promote its interest.

The decree of the Circuit Court must be affirmed.

*Decree affirmed.*

Separate Opinion, by BREESE, J. As at present advised, I am not prepared, at this time, to concur in all the views and reasoning of the opinion pronounced.

I am in favor of the judgment, and upon this ground: That there is no such alteration in the original route of the road, its prominent features and objects, by the amended act, as to change, substantially, the undertaking in which the parties had engaged, and in the stock of which they agreed to invest their funds, and, therefore, they are not exonerated from the payment of their subscriptions. These purposes and objects remain, substantially, unchanged.